UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————

EMMA MARTINEZ,

              Plaintiff,                              Case No.  1:15-CV-605

v.

                                              HON. ROBERT J. JONKER

COMMISSIONER OF SOCIAL
SECURITY,

              Defendant,

_____/

**OPINION**

       This is a social security action brought under 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner).  Plaintiff Emma Martinez seeks review of the Commissioner's decision denying her claim for supplemental security income (SSI) under Title XVI of the Social Security Act.

**STANDARD OF REVIEW**

       The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process.  *See Willbanks v. Sec'y of Health & Human Servs.*, 847 F.2d 301, 303 (6th Cir. 1998).  The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision.  *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  The Court may not conduct a *de novo* review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  It is the Commissioner who is charged

with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence.  *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance.  *See Cohen v. Sec'y of Health & Human Servs.*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993).  In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984).  The substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted).  This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision.  *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 41 years of age on the date of the Administrative Law Judge's (ALJ) decision.  (PageID.36, 54.)  She left school in the eleventh grade and has no past relevant work. (PageID.56, 77.)  Plaintiff applied for benefits under both Title II and Title XVI on October 5, 2012, alleging that she had been disabled since July 31, 2011, due to a back injury.[1]  (PageID.69, 138–48.)

---

[1]Based on the Court's review of the record, it appears that Plaintiff likely meant to allege an onset date of July 31, 2010, a date around the time of a surgery on her back.  This is what Plaintiff alleged at the hearing, although Plaintiff's counsel did not ask to amend the onset date.  (PageID.60.)

Plaintiff's Title II application was denied on October 13, 2012, due to a lack of earnings history, and her Title XVI application was denied on December 18, 2012.  Plaintiff thereafter appealed the ALJ's denial of her SSI claim by requesting a hearing before an ALJ.  (PageID.82–93.)  On October 30, 2013, Plaintiff appeared with her counsel before ALJ Paul Jones for an administrative hearing in which Plaintiff testified. (PageID.51–67.)  In a written decision dated December 6, 2013, the ALJ determined that Plaintiff was not disabled.  (PageID.36–50.)  On April 12, 2015, the Appeals Council declined to review the ALJ's decision, making it the Commissioner's final decision in the matter.  (PageID.24–29.)  Plaintiff subsequently initiated this action under 42 U.S.C. § 405(g).

## ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability.  *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[2]  If the Commissioner can make a dispositive finding at any point in the review, no further finding is required.  *See* 20 C.F.R.

---

[2]1.   An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. § 404.1520(b));

2.   An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. § 404.1520(c));

3.   If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. § 404.1520(d));

4.   If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. § 404.1520(e));

5.   If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed. (20 C.F.R. § 404.1520(f)).

3

§§ 404.1520(a), 416.920(a).   The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining the claimant's residual functional capacity (RFC).   *See* 20 C.F.R. §§ 404.1545, 416.945.

Plaintiff has the burden of proving the existence and severity of limitations caused by her impairments and that she is precluded from performing past relevant work through step four. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).   At step five, it is the Commissioner's burden "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Id.*

ALJ Jones determined Plaintiff's claim failed at the second step of the evaluation. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 5, 2012, the application date.  (PageID.41.)  At step two, the ALJ determined Plaintiff had the following medically determinable impairments: (1) spondyloarthropathy without herniation or impingement; (2) right foot drop; (3) benign hypertension; and (4) obesity.  (PageID.41.)  The ALJ determined, however, that these were not severe impairments because they did not significantly limit (or were expected to significantly limit) her ability to perform basic work-related activities for 12 consecutive months.  (PageID.41.)  In doing so, the ALJ provided a discussion of the medical evidence as well as Plaintiff's testimony, and noted that no doctor had opined that she was disabled or provided any functional limitations or restrictions.  (PageID.44.)  Having made his determination at step two, the ALJ ended his analysis and entered a finding that Plaintiff was not disabled from her application date through the date of the decision.  (PageID.46.)

## DISCUSSION

Plaintiff's Statement of Errors presents the following claims:

4

1.      The ALJ erroneously terminated the sequential evaluation process at the second step of the sequential evaluation process; and

2.      New and material evidence demonstrates that this case should be remanded pursuant to sentence six.

(PageID.338.)  The Court will discuss the issues below.

## 1.

The issue before the Court is whether Plaintiff established that she suffered from a "severe impairment" at step two of the sequential evaluation.  A "severe impairment" is defined as an impairment or combination of impairments "which significantly limits your physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  Under the Social Security Act, a disability is defined as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  The determination of a severe impairment at step two is used as an "administrative convenience to screen out claims that are totally groundless solely from a medical standpoint."  *Higgs v. Bowen*, 880 F.2d 860, 862–63 (6th Cir. 1988).

> [I]n this Circuit the step two severity regulation codified at 20 C.F.R. §§ 404.1520(c) and 404.1521 has been construed as a de minimis hurdle in the disability determination process. Under the prevailing de minimis view, an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience.

*Id.* at 862.  "Under this standard, the question in the present case is whether there is substantial evidence in the record supporting the ALJ's finding that [Plaintiff] has only a 'slight' impairment

that does not affect her ability to work." *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 90

(6th Cir. 1985).

Here, the ALJ determined that Plaintiff's medical condition presented such a "slight"

impairment as to fail to reach the *"de minimus* hurdle" of a severe impairment.  The ALJ relied in

part on the requirements set forth in SSR 85-28, "Titles II and XVI: Medical Impairments That Are

Not Severe" which provides in pertinent part as follows:

> The severity requirement cannot be satisfied when medical evidence
> shows that the person has the ability to perform basic work activities,
> as required in most jobs. Examples of these are walking, standing,
> sitting, lifting, pushing, pulling, reaching, carrying or handling;
> seeing, hearing, and speaking; understanding, carrying out, and
> remembering simple instructions; use of judgment, responding
> appropriately to supervision, coworkers, and usual work situations;
> and dealing with changes in a routine work setting. Thus, these basic
> work factors are inherent in making a determination that an individual
> does not have a severe medical impairment.

SSR 85-28, 1985 WL 56856, at *3 (1985).[3]

The record begins with a June 22, 2010, X-Ray on Plaintiff's spine due to back pain.

(PageID.297.)  While there was some disc space narrowing at L5-S1, Dr. Ellen Cavenagh found that

Plaintiff had only mild degenerative changes.  (PageID.297.)  A month later, it appears that Plaintiff

suffered a fall that caused severe back and knee pain.  This appears to be the basis for Plaintiff's

disability claim.  (PageID.60, 283.)  After the fall, Plaintiff sought treatment in which X-Rays and

ultrasounds revealed negative results. (PageID.291, 293, 295.)  However MRI scans on Plaintiff's

---

[3] Social Security Rulings (SSR's) "are binding on all components of the Social Security
Administration" and "represent precedent final opinions and orders and statements of policy and
interpretations" adopted by the agency.  20 C.F.R. § 402.35(b)(1).  While SSR's do not have the
force of law, they are an agency's interpretation of its own regulations and are "entitled to substantial
deference and will be upheld unless plainly erroneous or inconsistent with the regulation." *Kornecky
v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 498 (6th Cir. 2006).

back dated July 27, 2010 revealed an "extrusion of disc with free fragment that may be sequestered at this level, severely compromises the exiting S1 nerve root." (PageID.283–84.)  Another MRI on Plaintiff's right knee led the reviewing physician to suspect a partial tear of Plaintiff's ACL as well as a tear of the posterior horn and medial meniscus.  (PageID.286–87.)  It appears Plaintiff subsequently underwent surgery.  A discharge note from Sparrow Health system stated that Plaintiff was being discharged with a L5-S1 lumbar microdiscectomy.[4]  She was instructed regarding wound care, a diabetic diet, and fall precautions.  She was also instructed to schedule follow up visits with her physicians. (PageID.209.)

    After the discharge in July 2010, the record contains a few notes relating to complaints apparently unrelated to her fall.  On November 27, 2010, Plaintiff had a CT scan of her abdomen and pelvis for a complaint of pain.  (PageID.277.)  The test revealed no abnormal or remarkable findings, however, and there was no acute process identified.  (PageID.277.)  An ultrasound of her abdomen on the same date found some evidence of a fatty change in her liver, but no gallbladder disease.  (PageID.279.)  On January 5, 2011, Plaintiff had an X-Ray on her right hip due to complaints of right-sided pain.  (PageID.275.)  The result was a negative study, as there was satisfactory alignment, and no evidence of a fracture of other bony abnormality.  (PageID.275.)

    It wasn't until May 31, 2011, when Plaintiff visited Dr. Michael Mangan, D.O. for a refill of her medications that the record demonstrates Plaintiff sought further treatment for her back

---

[4]A microdiscectomy is a surgery in which "a small portion of the bone over the nerve root and/or disc material from under the nerve root is removed to relieve neural impingement and provide more room for the nerve to heal."  Peter F. Ullrich, Jr. *Microdiscetomy (Microdecompression) Spine Surgery*, SPINE-HEALTH, http://www.spine-health.com/treatment/back-surgery/microdiscectomy-microdecompression-spine-surgery (last visited May 10, 2016).

pain.  (PageID.234.)  At the visit, Plaintiff described continuing chronic low back pain since her surgery.  Plaintiff stated that she was unable to visit with the surgeon nor take physical therapy as she had to care for her five year old child.  She reported she was able to ride a bike and do home exercises.  (PageID.234.)  On exam, Plaintiff scored 5/5 on lower extremity muscle strength, although there was decreased sensation along her right distal thigh, her lateral right leg, and right third through fifth toes.  (PageID.235.)  Plaintiff's medications were refilled and she was referred to neurosurgery.  Dr. Mangan also indicated that a repeat MRI and pain injections may be considered.  (PageID.235.)

The record next contains several treatment records from Dr. Lynn Hartman.  On July 6, 2011, Plaintiff sought another refill of her medication.  She again described chronic low back pain, but this time with symptoms appearing only several months ago.  Plaintiff also stated she experienced weakness in her right leg.  (PageID.229.)  Under a "review of symptoms" Dr. Hartman noted that Plaintiff was "positive for back pain and gait problem."  After performing a physical exam, Dr. Hartman found Plaintiff had a decrease of motion and decreased strength at the right hip.  (PageID.230.)  The doctor noted that Plaintiff needed to see a neurosurgeon to clear her for physical therapy, and that the surgeon may want to order an MRI.  (PageID.229.)  Later that month Plaintiff again saw Dr. Hartman for a medication refill.  At this visit, Plaintiff complained of low back pain for the past three to four years, that the pain was made worse with bending or lifting, and that it radiated down her legs.  It was noted that Plaintiff appeared with an antalgic gait, with a reduced range of motion.  (PageID.227.)  Plaintiff also had a positive straight leg raise test at thirty degrees bilaterally.  However she had normal motor strength, sensation, and a heel and toe gait.  An X-Ray was not indicated.  (PageID.227.)  Dr. Hartman advised a home care exercise program and discussed

8

proper lifting techniques.  Plaintiff was also advised to avoid heavy lifting. (PageID.227.)  It was further noted that Plaintiff may want to consult with a pain clinic for injections as it was anticipated that Plaintiff would develop a tolerance to her pain medications.  (PageID.227.)  On August 31, 2011, Plaintiff saw Dr. Hartman to review lab results regarding her diabetes.  She was described as being in compliance with a diabetic diet, and there were no symptoms or concerns.  (PageID.225.)  This was the last note in the record from Dr. Hartman.

The next treatment note appears over a year later on October 19, 2012, when Plaintiff began treating with Dr. Christopher Chiou, M.D.  (PageID.219.)  At the first visit, Plaintiff complained of back pain due to the July 2010 fall.  Plaintiff stated she had undergone physical therapy, epidural injections, surgery, and medications, but that only her medications provided relief.  She noted, however, that she had recently changed her insurance and had run out of all her pain medications.  It is unclear how long Plaintiff had gone without taking medication.  (PageID.219.)  Plaintiff also stated she had a foot drop on her right foot, and noted that there was weakness in the area.  Finally, Plaintiff complained of a dull chest pain that had been ongoing for two months.  (PageID.219.)  On exam, Plaintiff had decreased strength in her right foot.  A right foot drop was also observed.  (PageID.220.)  Dr. Chiou noted that even though her back pain was chronic, "the associated foot drop worries me.  Thus I belive [sic] that an urgent consultation with neurosurgery is warranted."  (PageID.220.)  Dr. Chiou ordered the consult and also ordered a stress echo for Plaintiff's chest pain, but noted an EKG found no acute ischemia.  (PageID.221.)  Plaintiff's pain medications were refilled, and an additional medication to control Plaintiff's blood pressure was prescribed.  (PageID.221.)

A few days later, on October 24, 2012, Plaintiff went to the ER complaining of right knee pain.  She stated she rolled over in bed and felt something tear.  (PageID.199.)  An X-Ray, however, was negative.  Plaintiff was given some pain medication, advised to use ice and crutches, and to follow up with an orthopedic surgeon, though it is unclear from the record whether Plaintiff did so. (PageID.203.)

On October 30, 2012, Plaintiff had an MRI on her lumbar spine.  It was noted Plaintiff had a clinical history of hip pain and foot drop. (PageID.206.)   The MRI found disc space narrowing with disc desiccation.  There was mild diffuse bulging and mild to moderate bilateral neural foraminal narrowing.  There was no extrusion or central canal stenosis.  At L4-L5 there mild desiccation, bulging, and inferior neural foraminal narrowing.  (PageID.206.)  The impression was a mild to moderate spondyloarthropathy with no extrusion or nerve root impingement. (PageID.207.)  On November 20, 2012, Plaintiff met with Dr. Chiou to discuss the MRI results and for a medication refill.  Dr Chiou noted a "confusing" medical history, as the recent MRI found spondyloarthropathy, but no impingement, herniations or post-operative changes.  (PageID.214.)  He also noted that Plaintiff had been out of her medications for two months, but did not require medication until the day before.  It is unclear, then, whether Plaintiff had filled the prescription that was prescribed by Dr. Chiou on October 19, 2012.  (PageID.219.)  On exam, Plaintiff had a normal range of motion, but tenderness to palpation on her lumbar spine.  (PageID.215.)  She was positive for back pain, but negative for any joint swelling, arthralgias or gait problem.  (PageID.215.)  Dr. Chiou noted that Plaintiff stated her foot drop had resolved since the last visit a month earlier, and that she had not followed up with a neurosurgeon.  Dr. Chiou refilled Plaintiff's medications, but indicated that because he still believed that it was "vital" she consult with a neurosurgeon, he

would not refill the medications again until she did so.  Plaintiff was also given a drug screen. (PageID.216.)  Ten days later, however, in a patient care coordination note, Dr. Chiou noted that Plaintiff's drug test had come back positive for THC, and that Plaintiff did not return his phone calls. Dr. Chiou asked that Plaintiff not be prescribed any further pain medications.[5]  (PageID.213.)  This is the last note from Dr. Chiou.

Plaintiff next began treating with Dr. Peter Cooke.  On the first visit, dated August 6, 2013, Plaintiff complained of unexpected weight loss and a urinary tract infection.  (PageID.305.) Dr. Cooke noted Plaintiff's history of anxiety and chronic back pain, and further noted that Plaintiff had not been taking her anxiety medication for the last six months, but was regularly receiving cortisone injections for her back pain.  While Plaintiff had a positive right straight leg raise test, it does not appear that Dr. Cooke prescribed any treatment during that visit.  (PageID.305.)  Plaintiff returned to Dr. Cooke on August 29, 2013.  The doctor noted that Plaintiff had visited the ER two weeks earlier for pancreatitis, and was still experiencing the same pain.[6]  Plaintiff further reported she was unable to eat, and was having trouble sleeping.  She still experienced back pain.  It was noted that Celexa made her cry and feel depressed.[7]  (PageID.304.)  Subsequent treatment notes refer to a hospital admission for further observation, but that Plaintiff left against medical advice due to

---

[5]At the hearing, Plaintiff indicated she smoked marijuana and ate brownies containing marijuana.  Plaintiff stated she had a license for medical marijuana, though notes to that effect do not appear in the record.  (PageID.61.)

[6] On August 9, 2013, Plaintiff had a CT and ultrasound scan on her abdomen, apparently connected to her ER visit.  The CT scan revealed no acute findings.  The ultrasound found a dominant follicular cyst within the left overy, but no acute abnormalities in the pelvis. (PageID.307–08.)

[7] The record shows Celexa was continually prescribed to Plaintiff (PageID.225, 228.)  It appears this is the first time Plaintiff had complaints regarding the medication.

insurance issues.   The record, however, does not contain any notes regarding this visit. (PageID.315.)

On September 19, 2013, Plaintiff had an ultrasound of her abdomen after complaining of pain.   The focus appeared to be on the gallbladder, however the study turned out to be unremarkable.  (PageID.303.)  The last treatment note in the record is a note from the ER in which Plaintiff sought treatment for chest pain on September 24, 2013.[8]  (PageID.315.)  It was noted that Plaintiff has a history of anxiety, hypertension, and chronic back pain. (PageID.315.)  An EKG returned normal results, however, and it appears the physician believed Plaintiff was suffering from menstrual cramps.  The last note reflected that Plaintiff was feeling better.  (PageID.321.)

Based on the above, the Court agrees with Dr. Chiou that Plaintiff's medical history, as it exists on this record, is "confusing."  The parties apparently do not dispute that Plaintiff had surgery on her back, but there are only minimal records relating to the surgery, and no follow up records from her surgeon.  Perhaps due to a lack of insurance, or for other unknown reasons, Plaintiff went long periods without taking prescribed medication and scheduling visits with physicians. Considering the above, the Court concludes the ALJ has presented an arguably persuasive rationale as to why Plaintiff should ultimately be denied disability benefits, but finds that substantial evidence does not support the ALJ's determination that Plaintiff's claim failed at step 2.   The treatment records from Dr. Hartman demonstrate that Plaintiff had weakness in her right leg that caused her to walk with an antalgic gait.  Dr. Hartman also advised Plaintiff to avoid heavy lifting.  The notes from Dr. Chiou show that even with the October 30, 2012 MRI, and Plaintiff's reported resolution

---

[8]An opinion from Dr. Cooke that was not considered by the ALJ and that post-dates the administrative hearing will be discussed in the next section.

of her foot drop, he still believed it was vital that Plaintiff consult a neurosurgeon.  Even after the MRI, Plaintiff presented with a positive straight leg raise test.  While the Court would prefer a more complete record, as it is the record shows Plaintiff's impairments are more than a slight impairment such that it passes the *de minimus* hurdle required in this Circuit.  Accordingly this matter will be remanded to the Commissioner for further consideration with instructions to continue the sequential analysis.

While the Court finds that the ALJ's decision fails to comply with the relevant legal standards, Plaintiff can be awarded benefits only if proof of her disability is "compelling." *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and award benefits if all essential factual issues have been resolved and proof of disability is compelling).  While the ALJ's decision fails to comply with the relevant legal standard, there does not exist compelling evidence that Plaintiff is disabled.

**2.**

Plaintiff appeared with her counsel for the administrative hearing on October 30, 2013.  (PageID.51.)  At the hearing, Plaintiff appeared in a wheelchair and claimed that she needed assistance with showering.  She further claimed that a doctor had told her she needed a wheelchair, but that her insurance would not pay for it, so she obtained one from a garage sale.  (PageID.55–56.)  The record through the hearing, however, does not contain a prescription for a wheelchair.  On November 22, 2013, between the hearing and the ALJ's December 6, 2013 decision, Dr. Cooke filled out a two-page worksheet containing check-boxes and blanks for short answers.  The gist of Dr. Cooke's opinion was that Plaintiff needed a wheelchair, and could not stand on her own.  (PageID.323–24.)  While the opinion was submitted to the Appeals Council, it was not considered

by the ALJ.  Plaintiff argues that the case should be remanded for further consideration of the opinion under sentence six.

When a plaintiff submits evidence that has not been presented to the ALJ, a court may consider the evidence only for the limited purpose of deciding whether to issue a sentence-six remand under 42 U.S.C. § 405(g). *See Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988) (per curiam).  In a sentence-six remand, a court does not rule in any way on the correctness of the administrative decision, neither affirming, modifying, nor reversing the Commissioner's decision.  *See Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991).

The standard in determining whether to remand a claim for the consideration of new evidence is governed by statute, 42 U.S.C. § 405(g), which provides in pertinent part that "[t]he court . . . may at any time order the additional evidence to be taken before the Secretary, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  "In order to obtain a remand for further administrative proceedings, Section 405(g) clearly requires a showing of both materiality and good cause." *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 149 (6th Cir. 1996).  Good cause is shown for a sentence-six remand only "if the new evidence arises from continued medical treatment of the condition, and was not generated merely for the purpose of attempting to prove disability." *Koulizos v. Sec'y of Health & Human Servs.*, 802 F.2d 458, 1986 WL 17488 at *2 (6th Cir. Aug.19, 1986). In order for a claimant to satisfy the burden of proof as to materiality, she "must demonstrate that there was a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore*, 865 F.2d at 711.

14

To the extent that Plaintiff seeks a sentence-six remand for further consideration of this matter under sentence six, such a request should be denied because Plaintiff has not shown that there is good cause for failing to present this evidence to the ALJ.  A review of the transcript from the administrative hearing shows it was readily apparent how the ALJ would rule, and it appears Dr. Cooke's letter was drafted as an attempt to persuade the ALJ to come to a different conclusion. The good cause requirement is not met by the solicitation of a medical opinion to contest the ALJ's decision. *See Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir.1997) (observing that the grant of automatic permission to supplement the administrative record with new evidence after the ALJ issues a decision in the case would seriously undermine the regularity of the administrative process); *see Koulizos*, 1986 WL 17488 at *2. Accordingly, Plaintiff has failed to demonstrate good cause.

Even if Plaintiff had good cause for failing to present this evidence, Dr. Cooke's completed worksheet is not material.  The worksheet consists largely of checked boxes and short conclusory phrases that Plaintiff cannot stand, and provides no accompanying explanation for the doctor's opinion.  The record also contains no treatment note for the last date that the doctor supposedly examined Plaintiff.  The Sixth Circuit has recently stated that similar worksheets, unaccompanied by any explanation, as here, are "weak evidence at best." *Hernandez v. Comm'r of Soc. Sec.*, No. 15-1875, 2016 WL 1055828, at *4 (6th Cir. Mar. 17, 2016); *see also Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 525 (6th Cir. 2014) ("A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.") (quoting SSR 96-2p). Accordingly, Plaintiff's request is denied for a failure to show good cause and materiality.  The Court notes, however, that the case is being remanded under sentence four, and accordingly Plaintiff will have an opportunity to further argue her case for benefits.

15

**CONCLUSION**

For the reasons articulated herein, the undersigned concludes that the ALJ's decision is not supported by substantial evidence.  Accordingly, the Commissioner's decision is **REVERSED** and this matter is **REMANDED** under sentence four of 42 U.S.C. § 405(g).  On remand, the Commissioner is directed to continue the sequential analysis.

Dated: _____May 19, 2016_____          /s/ Robert J. Jonker_____
                                          ROBERT J. JONKER
                                          CHIEF UNITED STATES DISTRICT JUDGE